For six years, Emery Barron woke up alone in a small cell where he spent at least 23 hours a day surrounded by nothing more than constant blaring music and the yells of other inmates in adjoining cells. On the rare occasions he was permitted to leave he was subject to regular strip searches and appellees kept him in these conditions for years even as his mental and physical health deteriorated. These conditions give rise to two claims that should have gone to the jury. An eighth amendment claim grounded in appellees deliberate indifference to the harms Mr. Barron suffered while in prolonged solitary confinement without legitimate penological purpose and a with only a sham review that did not meet the minimum requirements set out by this court. And finally, there is an unrelated eighth amendment claim arising out of appellees indifference to Mr. Barron's serious medical condition of sarcoidosis which resulted in his legal blindness while incarcerated. I'd like to start with the procedural deficiencies inherent in the review process Mr. Barron was provided. Just going back to the beginning, you don't dispute that prison officials were justified in placing Mr. Barron in solitary confinement in 2015 based on his actual assaults on correction officers do you? No, your honor. The dispute arises from his prolonged solitary confinement for years after this initial solitary confinement at which they used nothing more than the original initial misconduct to continue to justify that confinement over time making it nothing more than what this sour beer calls a repetition of misconducts and behavior. So when did the step down program process begin? 2017? Yes, your honor. He was placed in a step down program originally in 2017 and was there for a year and five months but while in the step down program he remained in the same restrictive housing unit as he was supposed to progress through the step down program during which he was also provided very limited guidance about how to move through the step down program, how that would actually earn him out of place into general population out of solitary confinement. So those step down program reviews also did not meet the minimum requirements set out by this court and Mr. Wetzel remained the final decision maker over his case. So after step two he what he to kill a corrections officer. Is that correct? Is that correct? 2019? Yes, judge. There was a initial there was a misconduct in 2019 where he was alleged to have threatened an officer who he had made multiple complaints about Mr. Barron for strips harassing him during strip searches officer dare on multiple occasions. It's not necessarily the court or the department of corrections did not necessarily offer that misconduct as the reason that he remained in solitary confinement. I believe there's a review from 2019 or a vote sheet that the program review committee offers to Mr. Wetzel which they argue that his bad attitude and you know negative perceptions were impacting him in uh at that in solitary confinement at that point which is again very similar to this court what this court found deficient in sour beer which was um like a standoffish attitude that's not enough reasoning at the point of these reviews but again the primary violation here was that Mr. Barron was provided no opportunity to even informally make his case to Mr. Wetzel who was the department of corrections designated as the final decision maker over his placement and this court has very clearly laid that out as a requirement in Schultz by incorporating the requirements from Hewitt v Helms into regular reviews and that was later made crystal clear in Williams in 2017 when this court found there must be regular meaningful reviews with a meaningful statement of reasons for continued placement at no point was that made clear by the program review committee you can see in the record at multiple points they simply state that he would remain in solitary confinement because of his restricted release list status and continue to tell that to him over and over again at one point a corrections counselor even tells him to smile more he's just really not given any specific guidance about how he can earn his way into general population he did with regard to the step down program that was he was involved with in 21 through 23 so i guess the theme of today is when do you question when do you cross the line uh and in this case when do you cross the line from where there's an eighth amendment violation i guess you start off by saying it's duration of confinement yes your honor but there's not a there's a balancing act here and and you you can't have somebody in the general population if he's if he's acting out and threatening uh corrections officers it just doesn't work when do you cross the line yes your honor here there had to be cut at the point at which the duration matters the point at which his solitary confinement became prolonged which is court is found to be as little as seven months in clark and as little as month stints over a period of years in polakovic what's important here is that even if this court can rely on informal evaluations and predictions by corrections officers and staff like in schultz that's not happening here this the corrections officers the program review committee and wetzel by signing off on it was relying on nothing more than largely his initial misconducts and vague hand-waving at his behavior while in solitary confinement that would not make up the substance of an original decision to keep him in in solitary confinement or to place him originally they're continuing to rely on his charges and his initial misconduct even as far as six years into his solitary confinement and to your point about the step-down program in 2021 he's placed in the intensive management unit not necessarily labeled as a step-down program i believe in june of 2021 by a facility-wide memo sent out by john wetzel to um all inmates in the in his facility at that point that after six months after this the litigation in this instance had already been filed um i think that timing is particularly important here but at that point he had again already been in solitary confinement for almost six years before filing this litigation far longer than this court has found to be prolonged in both polakovic and clark um so that time period is particularly important um but if i can also move on to the eighth amendment claim and the end uh appellees deliberate indifference here there were multiple instances where um appellees specifically became aware that mr barron was suffering from a serious mental health condition beginning in 2016 at two seven uh joint appendix 273 mr barron was placed in a suicide smock on at least one documented occasion um appellees had full access to this record there was also a hunger strike that mr barron started because he was paranoid about something being placed in his food and despite there not being a formal diagnosis as there was in polak vincent clark appellees cannot simply hand wave away this concrete evidence that mr barron's mental health suffered through the constant isolation of solitary um and that became clear again as he continued to request full psychological evaluations as were done in schultz to determine that plaintiff's continued risk that would require him to remain in solitary confinement so this is again at minimum a factual dispute which should have been resolved in mr baron was mr um baron's eye condition um caused by the solitary confinement or it it it arose before or in conjunction like what is our causation issue um no your honor also the eighth amendment medical indifference claim which we're arguing that his eye condition worsened is separate from the conditions of solitary confinement he had this pre-existing condition of sarcoidosis that worsened because of the delay in his medical appointments in the surgery that i believe he was supposed to receive that defendant cronauer here acknowledged that he had the appointments for noted he would look and they were delayed for such a long period that resulted in him going legally blind as the result of that condition so it's separate even from the conditions separately in solitary confinement that were resulting in his um the harm to his physical and mental health separately over time you also allege the uh the confinement conditions were lacking heating ventilation air air uh air conditioning probably would be ventilated part of ventilation and was rodent infested they're obviously quite concerning uh but why wasn't there any is there what record evidence is there it creates a genuine dispute effect yes your honor here the court um the district court largely relied on the duration of the solitary confinement and the supposed um access to certain privileges that mr baron had to determine that he was not in prolonged solitary confinement at that point or that the conditions were not negative what we would argue is that at the point at which the solitary confinement became prolonged regardless of these other um conditions like the music the rodents that underscore the isolation and physical impact of solitary simply being in prolonged solitary with a serious mental health condition for over the minimum period of time that this court has established that is what allows the eighth amendment claim to continue here and the district court um wrongly resolved that in favor of the appellees at is that a per se standard you're asking for them i'm sorry follow not in terms of we're not asking the court to find that solitary confinement is per se unconstitutional but prolonged solitary confinement again at the length of time that occurred here with the defendant with the um plaintiff here mr baron's serious mental health condition that's what this court has made clear in porter as well as previous cases or as well as subsequent cases polakvic and clark as well as in williams in 2017 which was a 14th amendment case but incorporated much of the same reasoning the recognition of the harms that isolation specifically that being in this small cell over years long period of time has these are all contextual circumstantial elements and we've never held i'm not sure anyone has ever held that solitary confinement secret you know segregation in detention of any sort is a is a per se violation of the eighth amendment right again your honor it's as a result of the seer the serious meant deliberate indifference to the serious mental health condition that mr baron suffered while in solitary confinement and the unique harms of prolonged solitary confinement here so not really an eighth amendment claim then i mean it starts to almost sound substantive to me that you're almost sort of blending the eighth amendment claim with the due process claim to kind of create a new right that if these facts exist then you have a liberty interest if you will to be free from them no your order again a similar eighth amendment violation was found in that case based again on similar conditions that that plaintiff was in yes for a longer period of time but also a much longer period of time um yeah and it sort of suggested that that was a possible cause of action i don't think it actually held that those things were i just sort of tried to ground is your argument really fact-based and if so what do we do with the evidentiary problems that you know the judge coming from yes your honor we argue that the reasoning from williams was imported into eighth amendment jurisprudence in porter and in polakovic and clark points at which this court has found a prolonged solitary confinement at a much shorter duration than it found prolonged solitary confinement in porter and which mr baron's period of solitary confinement clearly meets here so while yes there are these again factual disputes about whether or not mr these allegations that mr baron is making in his complaint the point is that he suffered this court has recognized the very unique harms that plaintiffs with mental health conditions suffer while in prolonged solitary confinement for a year's long time that's specific in porter this court has mentioned the updated research and a large acceptance of the unique harms of confinement specifically on mental health there are difference between an inmate who spends six years in solitary confinement period versus one who spends six years in solitary confinement because during that period he's had multiple disciplinary incidents that prevent him from coming out or put him back in again your honor we hear there's a dispute in fact about why again mr baron is remaining in solitary confinement for six years they're relying largely on his initial misconduct apart from there's a there's a i understand the facts are contested but just from an eighth amendment perspective is there a difference between six years period versus six years with you know with arguable facts thrown in um your honor at that there you know there can be an argument about legitimate penological purpose yeah of course that um that can be made however here yes that the the right here at issue is qualified by whether or not um appellees could find a legitimate penological purpose that's what i'm getting in this case um however here we are you again there's a dispute of fact about whether or not there was a legitimate penological purpose for keeping mr baron in solitary confinement for six years and that appellees themselves don't particularly seem to articulate one until the response brief in this case they're uh the department of corrections again is continuing to rely on his initial misconduct okay i believe there's pending challenge uh pending charges as well from participation in the prison riot is that correct um i'm not sure exactly what you're referring to your honor for mr baron here i believe he's pending charges right now he's um not pending um i'm not sure he's out on he's recently released so um from i'll ask i'll ask your colleague on the other side i can get that information no thank you okay thank you yeah i'm not sure she had lost it yes or maybe a reason yeah okay please accord i'm jeff paladina i represent uh former secretary john wetzel and three employees at sei dallas um late former superintendent kevin ransom and deputy superintendents crown and miller in this case that mr baron sued um i'm eager to talk to you about this case your honors because it demonstrates the tight rope that prison officials have to walk on one side of the tight rope you have an inmate mr mr baron who's twice assaulted officers sucker punched attacked unsuspecting officers at two different institutions and they don't want to give him a third chance to do that because the consequences could be dire on the other hand we can't be indifferent to his mental health treatment and we weren't so we're balancing his individual rights against prison security and making difficult judgment calls about when it is safe to release him in a general population i want to talk first about what is in the record and isn't in the record about psychological decompensation for mr baron because i believe that this is a key point that distinguishes this case from some of the other cases that we have regarding solitary confinement um we put in his inmate cumulative adjustment record in the summer judgment record and it shows weekly monthly over and over again a member of the psychology team would check in on mr baron and it was you know the same type of entries i spoke with mr baron asked him if he was having any problems psychologically he denied he denied self-harm denied injury denied mental illness and i told him that how to access cycle psychology if if he needs to and there are no contraindications to um keeping him in the rhu one one obvious distinction between this case and pakovic and in those cases there were diagnosed psychological problems your friend says all right there was no diagnosis but like he was in a suicide he was on a suicide watch and there were signs that should have put people on notice that he had psychological problems sure and let me talk about that there is nowhere not even in his unverified complaint or in his briefing where mr baron has ever alleged that he was suicidal or expressed suicidal ideation um my friends on the other side are great lawyers superstar future lawyers and they scored the record for some evidence of him being in a suicide splock and what we have excuse me what we have is a period of about a week where a psychological service associate this is a ja273 went up to mr baron um tried to talk to him about an incident or an investigation noted that he was in a suicide smock and he was on movement restriction and wasn't able to talk to them um and then when they eventually were able to see him he denied uh any mental health concerns so what they're asking you to do is speculate and speculation is not enough to um it's you know it's not clearly established that the hunger strike itself is a mental decompensation you know sometimes it's behavioral sometimes it's manipulative and really we're looking not at whether or not these mental health evaluations were adequate but we're looking from the perspective of john wetzel and the employees at sci dallas who were reviewing the same records that you're reviewing a summary judgment and they're seeing baron denies uh any mental health issues if you look at um the restricted release reviews uh that were conducted by central office every one of them has a stability code written on them how does administrative custody interact with restricted release okay so um going to the due process issue um basically uh an inmate who's on administrative custody has i've talked factually how's how do they interact so an inmate who's on administrative custody gets reviewed every 90 days by the um program review committee and they at any point can recommend that that may be released to general population or recommend like we did in this case that you go to a step-down program and the only difference between a regular administrative custody person and someone who has a restricted release designation is the uh secretary or someone from the executive office the policies changed over the years but that time it said secretary or designee has to give the final sign off so that it's a that is one check that check is designed to make sure that someone's not released too early in the general population from central office but they also had uh former secretary wessell also instituted another check for the reverse reason um that he does his own annual reviews the central office has their own annual reviews of these inmates to make sure that they're not kept in solitary confinement too long so there's really two processes that are in place that work together one that 90 day review by the program review committee the second is the annual review um by central office and uh you know my the um my friends on the other side pointed out that um i acknowledge that in 2020 in the middle of covid some of those annual central uh restricted release reviews were delayed um so um baron didn't get one in 2020 but the program review committee reviews continued and district courts have um noted that um and they've noted the reason was covid and really covid is a backdrop of this whole case the time he was at dallas where he sued most of the people uh he was only there by the way for about seven or eight months before he filed suit um the timeline on that is that he was he went to dallas in november 1st 2019 and then in march 30th 2020 he was transferred inmate community uh adjustment records reflect that he was transferred to sci chester for an appointment and then he got stuck there during covid because the transfers weren't coming and then um he eventually makes his way back to sci dallas i believe november 2019 but he was still either he fell suit two months later he was still in solitary confinement or in some type of step down program from 21 to 23 right correct so after sure um he he was in a step down program two times what information does did mr baron receive to let him know what he had to do to progress through the step down program so um i put in the record the the memo that described the step down program but really the most important thing to look at is the step down reviews um they're in the record so um he received weekly reviews that he went over with him and these these involve his um individual recovery program which is uh designed with in coordination with his psychological team so some of these reviews even mention that there were some personality testing done to help um design this individual recovery plan plan and the identified goals for mr baron and this is j 372 um but there are numerous of these uh rrl step down program reviews um maintain misconduct free behavior by working on in-cell treatment work it says initiated avoid acting on angry emotions by developing an understanding of empathy initiated learn and practice skills to be in a more pro-social position initiated work through traumatic experiences by working on in-cell treatment materials and journaling initiated now they're calling this a sham but the the the business of rehabilitating human beings so they don't turn from someone who randomly attacks corrections officers into someone who's released into the general population safely where they could walk around and have an officer with their backs turned to them isn't an exact science um and and they're doing the best they can to come up with a plan to rehabilitate mr baron and you know really all he had to do was make me uh stay free from his conducts which he did not do and they gave him several chances you know what about the conditions of the uh of the cell lacking heat ventilation air conditioning rodent infested so he alleged that in his unverified complaint but he never he never there's no evidence in the record that weisel was i knew about those conditions he was deliberately indifferent to them or the any of the name defendants um you know what knew that there was a rodent problem that wanted i addressed and you know what's missing most of this record going back to the psychological issue is any grievance by mr baron that's saying i'm just compensating i mean he he filed all these requests lips letters to weisel as part of the summary judgment exhibits if you go through all of them you do an independent review of the record there is nothing in there where emory baron says i'm not being treated properly i'm decompensating i'm i'm feeling suspicious there's nothing that's obvious to these decision makers who he sued that um the psychological reviews were insufficient that the ones that say that that he's a stability a inmate that doesn't have any mental health issues so it all goes back down to deliberate indifference whether it's the mental health or whether it's the um prison conditions so williams clark they also they don't say but they you know sort of gesture that their individual that solitary confinement may become an eighth amendment problem how do we prevent them you know how do we prevent baron from becoming the next one of those um or why shouldn't baron become the next one in that line of cases there's no bright line your honor and they're difficult judgments and that's why qualified immunity in these cases is important um i would say that in this particular case um baron is entirely distinguishable from clark from plakovic because of the prison officials expressly noted his their mental health serious mental health issues schizophrenia yeah um what other options are there besides solitary confinement for keeping someone out of the prison population every time uh mr baron's freedom is increased so what other uh forget for the moment the individual what other options are there besides 23 hour a day solitary confinement are there for keeping someone out of the general prison population because of the threats that that person is perceived to give well i can tell you what the population or to corrections officers i can tell you tell you what the pennsylvania department of corrections has done um you know we've reformed restricted housing uh inmates now who are um in extended solitary confinement for a prolonged time um get three hours out of cell a day two for exercise one for where they sit at a restrained table like a texas table um where they can interact with other inmates and mr baron had you know some of these step down reviews talk about um well if i look at for instance when he was in the step down program at sei cold um i believe this is ja256 and again they're saying that the step down program wasn't materially different from his conditions that's not accurate at all on august 28 2018 the entry says inmate baron was offered and accepted one hour of activities education today's lesson plan was on physical fitness and conditioning which is very well received by the group inmate baron participated and even had a friendly contest with inmate lights who was seated next to him the class then watched and discussed the video the essentials of dumbbell training by juan santana health and fitness areas important areas of interest to this inmate no further actions so those are the types of things of these other you mentioned other options possibly was mr baron allowed to avail himself of some of those other options starting with let's say three hours out some interaction with other inmates was he was he given those opportunities during the step down program he progressed from phase five to four to three and he was given greater freedom and this was part of the step down program so there was additional out of cell time um and then his behavior deteriorated with that increased freedom when he started to get them his conducts he he was put in solitary in 2015 and the first step down program was in 2017 is there any was was there anything what was done during those two years that caused the prison officials to say he continues in the solitary confinement sure so the first year he got about five misconducts um covering the camera in a cell in may of 2015 refusing an order to be fingerprinted by the pennsylvania state police in july of 2015 removing a vent cover from a cell in march of 2016 a contraband misconduct in may of 2016 and refusing to obey an order again in may of 2016 so he's accumulating dc time during that first year and he's um not sued the you know he's not alleging the dupe there is a due process violation with his um hearing examiners or his hearing he hasn't made a separate claim about his disciplinary hearings so um part of that was a dc time and then after that um the following year before the step down program they were giving him privileges at the reviews and that's that's a behavior modification tool you know you start off with a few privileges you behave and then you get a tablet or you could email people you get increased phone calls that's to drive his behavior and when after a year when his behavior improved that's when they felt comfortable to use their judgment that was time to give him a chance at the step down program so that's what happened in the first two years okay thank you very much thank you um your honors i'll just start with where my friend on the other side started with this um point about his psychological decompensation and serious mental illness um the appellees in their response brief provide this kind of laundry list of record citations with these five minute check-ins where either corrections counselors or people from the psychological services department who i'd like to emphasize are not psychiatrists or psychologists providing full evaluations to him but instead are eliciting check-ins from him in front of his cell door in front of other guards other incarcerated individuals with this very short period um where they are simply just checking in with him listening to what he says and it's not designed to actually elicit information on his mental health it's a there's at least at minimum again a factual dispute here looking cumulatively at the evidence that appellees actually had of Mr. Barron's psychological decline the suicide smock his multiple requests for psychological treatment and evaluation that is also evident in his deposition here they um he says he hasn't spoken to a psychologist so he can't say whether or not he has a diagnosed mental health condition or not because he has not actually been able to speak to anyone despite multiple requests it's also not a requirement despite Palakovic and Clark underscoring the pre-existing condition in that case that um a an eighth amendment claim may stand in Porter there was no pre-existing mental health condition although it was required in that case for it to survive summary judgment was a corrections officer having direct knowledge of mental health decline what's relevant here is um appellee's knowledge of Mr. Barron's mental health decline and what they thought not necessarily a explicit mental health diagnosis and again the cumulative facts here demonstrate that he was decompensating also point to again the step down program here the the distinctions here only point to between administrative custody and RRL they frame them as an additional check but here there was again two and a half years even when in between when in 2019 appellees supposedly review Mr. Barron's claim on a yearly basis and then when they pass it on to Wetzel again in 2021 there's no COVID defense here it's not there's no legitimate penological purpose defense to 14th amendment violations here there was and Mr. Wetzel did not have or Mr. Barron did not have a chance to speak to Mr. Wetzel in the entirety of the time that he was on um in solitary confinement even on an informal written basis to make his case and that's clearly required from Schultz. I see if that's time this is for the questions. Okay, thank you. Thanks to the Boston University Appellate Clinic for taking this case pro bono and Ms. Sacco excellent job really are you still in school or congratulations really well done. You're screwing up your studying for the bar. Thank you both sides for your excellent advocacy and we'll take the case under advisory.